481 A.2d 886

**Joseph FRIEDMAN and Frida Friedman, Appellants,**

**v.**

**Victor I. KASSER and Barbara Kasser and Leonard Feldman and Bernice Feldman.**

Superior Court of Pennsylvania.

Argued Oct. 12, 1983.

Filed Aug. 24, 1984.

Petition for Allowance of Appeal Denied Feb. 11, 1985.

---

476

Marc M. Orlow, Philadelphia, for appellants.

Abraham C. Reich, Philadelphia, for appellees.

Before SPAETH, President Judge, and POPOVICH and HOFFMAN, JJ.

SPAETH, President Judge:

This is an appeal from a final decree adjudicating the boundary between appellants' property and appellees' property. We affirm.

The parties' arguments concern not the chancellor's findings of fact, which are not challenged, but the conclusions to be drawn from those findings. The findings, and the testimony from which they derive, may be summarized as follows.

Appellants, Joseph and Frida Friedman, owned jointly with Leonard and Bernice Feldman a large tract of land known as part of Kings Oak Estate in Abington Township, Montgomery County. The tract was subdivided into three lots, which were designated on a Lot Location Plan made for the Friedmans and Feldmans in April 1975. The lots here at issue were Lot No. 3 and Lot No. 5, the westerly side boundary of Lot No. 3 being shown as the easterly side boundary of Lot No. 5. The Friedmans and Feldmans had retained the firm of Lam and Buchsbaum as their agent to sell the lots. Findings of Fact Nos. 1 and 2.

In the Fall of 1976, appellees, Victor I. Kasser and Barbara Kasser, consulted Charles Samter, a real estate salesman employed by Lam and Buchsbaum, to learn whether he had any building lots for sale. Finding of Fact No. 3. Samter testified that he showed the Kassers Lot No. 3, and that they expressed interest in it. R.R. 104a. Mr. Friedman testified that he had "left everything to Mr.

Feldman" so far as the sale of the lots were concerned. R.R. 66a; *and see* chancellor's Adjudication, Brief for Appellants at 37. Samter therefore told Feldman that the Kassers were interested in Lot No. 3, and he asked Feldman to meet him and the Kassers at the lot to show the Kassers its dimensions. Finding of Fact No. 5. As it happened, the meeting could not be arranged, and Feldman met Samter at the lot alone. *Id.* There Feldman gave Samter a plot plan, which showed the western portion of the large tract, including Lot No. 3. Exh. D–1. Feldman then paced off the lot's boundaries, which were staked off, proceeding from stake to stake. As Feldman showed Samter a stake, Samter would tear off a strip from a piece of cloth he had gotten from his car, put a number on the strip, tie the strip on the stake, and write the number he had written on the strip on the corresponding place on the plot plan. Finding of Fact No. 6; R.R. 105a–106a; Exh. D–1. Feldman testified that he told Samter that "[i]t's [the staking] probably off a little bit but we aren't sure what" and that "whoever bought the property" "should obtain his own survey." Finding of Fact No. 7; R.R. 141a–142a.

A few days after meeting with Feldman, Samter showed the lot to the Kassers. In his testimony describing the meeting, Samter said that he pointed out to the Kassers the stakes he had tagged to show the dimensions of the lot, and gave them a copy of the plot plan he had numbered to indicate the location of the tagged stakes. R.R. 108a. Samter did not testify that he had told the Kassers anything about the staking "probably [being] off a little bit," or about the possible advisability of getting a survey, and we may take it that he made no such statements; Mr. Kasser in his testimony described the meeting as had Samter, *i.e.,* as "[w]alk[ing] around the property, map in hand, finding each of the numbered stakes", R.R. 84a; and the chancellor describes the meeting in the same way. Finding of Fact No. 9.

After their meeting with Samter, the Kassers conferred with a builder to learn whether it would be feasible to build

a house on Lot No. 3. The builder walked the lot while Mr. Kasser pointed out the stakes Samter had numbered and tagged. Kasser also gave the builder a copy of the numbered plot plan. When the builder said that it would be feasible to build a house on the lot, the Kassers bought the lot. Findings of Fact Nos. 9–14. The agreement of sale described the property sold as "Lot # 3 (3.19 acres). Plan of part of Kings Oak Estate dated April 2, 1975. Exhibit "B" attached and described in "B–1". Exhibit P–4; Finding of Fact No. 14. The agreement also provided that "[i]t is further understood that this Agreement contains the whole agreement between Seller [the Friedmans and Feldmans] and Buyer [the Kassers] and there are no other terms, obligations, covenants, representations, statements, or conditions, oral or otherwise, of any kind whatsoever concerning this sale." *Id.*

After the Kassers had bought Lot No. 3, the builder laid plans for building the house, using the numbered stakes as guides in order to comply with zoning side yard requirements. Finding of Fact No. 15. Although the builder ordered a survey for certain right-of-way angles of the property, he did not do so for the common boundary between Lot No. 3 and Lot No. 5 because the boundary was marked by the stakes Samter had tagged. Finding of Fact No. 16. The proposed location of the house was approved by the township, a building permit was issued, the house was built, Finding of Fact Nos. 17–18, and in the Fall of 1977 the Kassers moved into the house, R.R. 89a.

In the Spring of 1978 the Friedmans obtained full title to Lot No. 5 from the Feldmans—it will be recalled that the lot had been owned jointly by the Friedmans and Feldmans— and they moved into the house there. Finding of Fact No. 21; R.R. 89a. Shortly afterwards, the Friedmans had two blacktop parking pads built, within the area that had been designated by the numbered stakes. *Id.* A dispute between the parties ensued, and in July 1978 Mr. Friedman ordered a survey of the property as it was described on the Lot Location Plan that had been made in April 1975, and as

it had been described in the deed to the Kassers. R.R. 60a (Friedman), 94a–95a (Kasser). The survey disclosed that the front left corner of the Kassers' carport encroached 5.8 feet upon the Friedmans' property, and the Kassers' driveway, constructed in a curving line from the carport to the road, encroached to a varying extent up to 45 feet. Finding of Fact No. 19.

In August 1978 the Friedmans filed a complaint in equity, asking that the Kassers be required to remove their carport and driveway, and also, so much of their house as was within 15 feet of the Friedmans' property, as that property was shown on the survey, in violation of the side yard requirement of the township zoning ordinance. The Kassers answered, denying any encroachment, and asking by counterclaim, that the Friedmans be required to remove their parking pads and to cease their continuing trespass on the Kassers' property, as that property had been staked out. By further pleadings, the Feldmans were joined as additional defendants, and in May 1980 the matter was heard by the chancellor. On July 28, 1980, the chancellor filed an adjudication, including findings of fact and conclusions of law, and a decree nisi, finding in favor of the Kassers. Specifically, the decree directed the Friedmans and Feldmans to execute a deed conveying to the Kassers such additional property as would make the Kassers' property "correspond with the actual boundaries established by the stakes with numbered cloths as demonstrated by their [the Friedmans' and Feldmans'] agent, Charles Samter" and further directing the removal of the Friedmans' parking pads and the restoration of the property to the condition it was in prior to construction of the pads. On December 3, 1980, the Friedmans' and Feldmans' exceptions to the decree nisi were dismissed by a court en banc. The Friedmans appealed, but on December 30, 1981, the appeal was quashed because no final decree had been entered. *Friedman v. Kasser*, 293 Pa.Super. 294, 438 A.2d 1001 (1981). On January 22, 1982, a final decree was entered, and on February 12, 1982, the Friedmans filed the present appeal.

As appellants, the Friedmans have made seven separate arguments, challenging various aspects of the chancellor's decree. The resolution of two of these arguments, which the Friedmans label as their second and third arguments, is dispositive. We shall therefore start our consideration with a discussion of these arguments, reserving consideration of the remaining arguments until later.

The basis of the chancellor's adjudication is the law of agency. In his view, "[t]he Friedmans and Feldmans are bound by the acts of Charles Samter in demonstrating the boundaries of Lot No. 3." Conclusion of Law No. 6. By their second argument, the Friedmans assign this as error.

In support of this argument, the Friedmans say that "neither Samter nor the Kassers testified that Samter indicated to the Kassers that the boundaries which he, Samter, demonstrated to them were the accurate boundaries." Brief for Appellants at 20. The record is to the contrary. Asked about "this tour that you made of that lot", when he pointed out to the Kassers the stakes he had numbered, Samter testified:

... How could they buy this property until they'd seen it and walked the ground *to know exactly what they were buying?* They didn't know where the lines were, they had to find somehow to buy the property, after they walked the property with me, *saw their lines,* they then at a future date bought the property; no other way to buy it until *they've seen what they're buying.*

R.R. 109a (emphasis added).

Nevertheless, the Friedmans say, they are not bound by Samter's demonstration of the boundaries because "Feldman specifically advised Samter that the boundaries as pointed out by Feldman were approximate only", Brief for Appellants at 21, and "neither Friedman nor Feldman knew or authorized Samter to represent as accurate and definite, the boundaries to the ground as 'walked off' by Feldman; *id.* at 22. In support of this argument, the Friedmans cite *Shane v. Hoffman,* 227 Pa.Super. 176, 324 A.2d 532 (1974), for the proposition that a principal is not liable for his

agent's misrepresentation unless he had knowledge of the misrepresentation. However, that case required knowledge on the part of the principal to hold him liable for fraud, and appellants are not accused of fraud here.

The liability of a principal to third parties for the act of an agent may rest on express authority, implied authority, apparent authority, or agency by estoppel. *Apex Financial Corp. v. Decker,* 245 Pa.Super. 439, 443, 369 A.2d 483, 485 (1976). Samter did not have express authority to represent to the Kassers that the boundaries were accurate. Nor did he have implied authority to do so. Implied authority is authority to do all that is proper, usual and necessary to the exercise of the authority actually granted. *Apex Financial Corp. v. Decker, supra.* The authority actually granted Samter was to show the property with the warning that the boundaries as paced off by Feldman were "probably off a little bit." It was not necessary to—indeed it was inconsistent with—the exercise of his actual authority for Samter to fail to convey this warning to the Kassers.

However, Samter did have apparent authority to represent to the Kassers that the boundaries were accurate. Apparent authority arises when the principal leads persons with whom his agent deals to believe that he has granted his agent the power to bind him. *Apex Financial Corp. v. Decker, supra.* Here the Friedmans, through Feldman, to whom they had "left everything," led persons dealing with their agent Samter to believe that Samter had the power to bind them. If a man of ordinary prudence would believe that the agent possessed the authority he purported to exercise, then the principal is liable for the acts of the agent. *Murphy v. Beverly Hills Realty Corp.,* 98 Pa.Super. 183 (1930). Here the Kassers were entitled as a matter of ordinary prudence to believe that Samter possessed the authority to show them the boundaries of the property. Samter exhibited a plot plan of the lot, prepared for the Friedmans and Feldmans and marked with numbers corresponding to numbers on stakes that had been pointed out by

Feldman. The Kassers had no reason to suppose that the apparently clearly staked boundary thus demonstrated by Samter was in fact incorrectly staked. The chancellor therefore properly concluded that the Friedmans were "bound by [Samter's apparently authorized demonstration of] the boundaries of Lot No. 3." Conclusion of Law No. 6.

■ The Friedmans argue, however, by their third argument, that the chancellor erred in admitting evidence of Samter's demonstration of the boundaries. In their view, the evidence was barred by the parol evidence rule, that is, by the interpretation clause in the agreement of sale that the "agreement contain[ed] the whole agreement" and there was "no other representations ... of any kind whatsoever concerning this sale."

■ In determining the applicability of the parol evidence rule, we have said that:

we should balance the extent of the party's knowledge of objectionable conditions derived from a reasonable inspection [of the property] against the extent of the coverage of the contract's integration clause in order to determine whether that party could justifiably rely upon oral representations without insisting upon further contractual protection or the deletion of an overly broad integration clause.

*LeDonne v. Kessler,* 256 Pa.Super. 280, 294, 389 A.2d 1123, 1130 (1978).

The Kassers had no knowledge of the objectionable condition—that the boundary was in fact not as demonstrated to them. They conducted a reasonable inspection of the lot; the boundary appeared to be staked; and the Friedman's agent unequivocally represented to them that as staked, the boundary corresponded with the boundary shown on the plot plan. While it is true that the Kassers could have learned of the objectionable condition by using an expert surveyor, our Supreme Court has said in *Berger v. Pittsburgh Auto Equipment,* 387 Pa. 61, 127 A.2d 334 (1956), that where expert tests rather than visual inspection were

necessary to determine the accuracy of a representation, a contractual integration clause was inapplicable and the parol evidence rule therefore was inoperative. Balancing the extent of the Kassers' knowledge against the extent of the coverage of the integration clause, we conclude that the Kassers could justifiably rely on Samter's oral representations regarding the boundary. The chancellor therefore properly held that the parol evidence rule did not preclude evidence of Samter's representations.

■ This conclusion is especially compelling if one considers a provision that was deleted from the agreement of sale. That provision was:

It is understood that Buyer has inspected the property ... and he has agreed to purchase it as a result of such inspection and not because of or in reliance upon any representation made by Seller ... or by the agent of the Seller....

Exh. P–4., para. 13.

By having this provision deleted from the agreement of sale, the Kassers did exactly what *LeDonne* requires: Since they *had* relied upon the Seller's agent's representation, they *did* insist[ ] upon further contractual protection," by having deleted what would have been an overbroad integration clause.

The Friedmans' remaining arguments may be disposed of summarily. Their first argument is that "[t]he encroachment by the Kassers on Friedmans' property should have been enjoined." Brief for Appellants at 17. This begs the question by assuming that there was an encroachment, or in other words, that they were not bound by Samter's demonstration of the boundary. The same observation may be made of the sixth and seventh arguments, which are, respectively, that the "Kassers' violation of the [zoning] sideyard requirements ... should have been enjoined," *id.* at 29, and that the chancellor "erred in ordering Friedman to remove these portions of their parking pads which were on the right of way," *id.* at 30. The fourth argument challenges the chancellor's discussion of natural and artifi-

cial monuments, and the fifth, his discussion of estoppel, *id.* at 26, 28; but we need not consider the issues raised by these arguments; as already noted, the chancellor's adjudication depends upon the resolution of neither of these issues but on the law of agency.

Affirmed.